2024 IL App (1st) 220033-U

No. 1-22-0033

Order filed March 29, 2024

Fifth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 02745 (02) |
| | ) | |
| ERIC DIAZ, | ) | Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment.

ORDER

¶ 1    *Held*: The defendant's sentence is affirmed where the trial court did not violate the Proportionate Penalties Clause of the Illinois Constitution as applied to him, did not abuse its discretion, and provided a fair sentencing hearing.

¶ 2    Defendant-Appellant, Eric Diaz, was found guilty of first-degree murder, an offense he committed when he was 17 years old, and was sentenced to 60 years' imprisonment. The Illinois Supreme Court instructed this court to consider the effect of *People v. Buffer*, 2019 IL 122327 and *People v. Holman*, 2017 IL 120655, on Mr. Diaz's sentence, and thus, remanded for a new

sentencing hearing. *People v. Diaz*, No. 117782 (Ill. Mar. 25, 2020) (supervisory order). Following the resentencing hearing, Mr. Diaz was sentenced to 35 years' imprisonment. On appeal, Mr. Diaz argues that: (1) his 35 year sentence violated the Illinois Constitution's Proportionate Penalties Clause as applied to him; (2) his sentence was excessive; and (3) he was denied a fair sentencing hearing. For the reasons that follow, we affirm.

¶ 3                                                    BACKGROUND

¶ 4      At trial, the following evidence was presented. On June 25, 2017, Jessica Gwinn met with Annette, Mr. Diaz, and brothers Nicolas, William, and Gabriel Martinez (Martinez brothers). See *People v. Diaz*, 2014 IL App (1st) 112586-U. At the time of the incident, Ms. Gwinn was 13 years old, Mr. Diaz was 17 years old, and the Martinez brothers were between the ages of 23 and 28 years old. Mr. Diaz was a member of the Maniac Latin Disciples street gang, and the Martinez brothers were members of the Latin Stylers. The group got into a Chevy Caprice and drove around.

¶ 5      While driving near Marmora and Fullerton, they drove past a group of young men, including Enrique Ruiz, Robert Willis, Anthony Martinez, and Nicolas Dezort, who rushed toward their car, flashing Milwaukee Kings gang signs. As they drove away, Mr. Diaz and the Martinez brothers flashed their gang signs back.

¶ 6      After the encounter, Mr. Diaz made a phone call and asked for a gun. He directed the driver of their vehicle to a certain location and retrieved a gun wrapped in an orange shirt. He then directed the driver to go back to the area where they had seen the Milwaukie Kings. The group drove past the young men on Marmora, turned left on Altgeld, and then stopped. Mr. Diaz got out of the car, covered his face with the shirt, and walked towards the group of young men. The young

men ran from Mr. Diaz and heard a series of gun shots. Nicolas Dezort was shot in the back and died from the injury.

¶ 7 Mr. Diaz testified that he was a member of the Manic Latin Disciples street gang in June 2007. He stated that on June 25, 2007, he went to the Martinez brothers' house. They all got into a car and drove around while drinking. He admitted to carrying a gun. He testified that on the corner of Fullerton and Marmora, members of the Milwaukee Kings street gang were throwing up gang signs. In response, Mr. Diaz and the Martinez brothers threw their own signs and left the area.

¶ 8 Mr. Diaz stated that as they drove away, the Martinez brothers were mad about what happened. The group then went to "JD's" house, but Mr. Diaz denied receiving a gun from JD. Mr. Diaz stated that Nicolas Martinez wanted to go back to Fullerton and Marmora to see what the Milwaukee Kings were doing. When they drove past them again, the Milwaukee Kings flashed more gang signs. Mr. Diaz then got out of the car and asked, "What's the problem?" According to Mr. Diaz, Mr. Dezort turned around and said, "What's up, MK love b***," and reached inside his pants pocket. Mr. Diaz backed up and reached for his gun. He stated that when Mr. Dezort saw Mr. Diaz's gun, he began to turn away, but Mr. Diaz began firing because he believed Mr. Dezort was going to shoot him.

¶ 9 At the close of evidence, the jury found Mr. Diaz guilty of first degree murder and personally discharging a firearm that proximately caused Mr. Dezort's death. On February 17, 2011, the trial court sentenced Mr. Diaz to 40 years' imprisonment with an additional 25 years, imposing a firearm sentencing enhancement, for a total of 65 years. On March 8, 2011, the court

granted Mr. Diaz' motion to reconsider his sentence, reducing the term to 35 years with the 25-year firearm enhancement, totaling 60 years' imprisonment.

¶ 10    On direct appeal, Mr. Diaz argued, among other things, that his 60-year sentence violated the Eighth Amendment pursuant to *Miller v. Alabama*, 567 U.S. 460 (2002). This court rejected those arguments and affirmed his conviction and sentence. See *People v. Diaz*, 2014 IL App (1st) 112586.  Diaz filed a petition for leave to appeal in the Illinois Supreme Court, which was denied on January 25, 2015. See *People v. Diaz*, 388 Ill. Dec. 5 (2015). He then filed a petition for writ of certiorari in the United States Supreme Court, which was denied on November 2, 2015. See *Diaz v. Illinois*, No. 14-9560, 2015 WL 1957757 (2015).

¶ 11    The Illinois Supreme Court granted Mr. Diaz's motion to reconsider its denial of his petition for leave to appeal under *People v. Reyes*, 2016 IL 119271. While his revived petition was pending, the supreme court decided *People v. Holman*, 2017 IL 120665 and *People v. Buffer*, 2019 IL 122327. On March 25, 2020, the supreme court denied the petition but directed this court to vacate its judgement in Mr. Diaz's case, with instructions to consider the effect that *Buffer* and *Holman* had on his Eighth Amendment claim. This court then remanded for a new sentencing hearing on July 20, 2020.

¶ 12    Mr. Diaz's second sentencing hearing took place on December 9, 2021. At that time, Mr. Diaz was 32 years old and had served 14 years in prison. At the hearing, the parties adopted the 2011 presentence investigation report, as modified by the new evidence presented at the hearing. In aggravation, the State was limited to an Illinois Department of Corrections (IDOC) disciplinary summary and numerous victim impact statements. The IDOC report listed 21 findings of guilty for a variety of offenses, including offenses of intimidation or threats, disobeying a direct order,

possession of dangerous contraband, planned violent assault on staff/assaulting staff, and gang or unauthorized organization activity. The State then presented eight victim impact statements from Mr. Dezort's family members, and "numerous" other unsigned statements.

¶ 13    In mitigation, defense counsel presented testimony from Mr. Diaz's older sister, Elia Diaz. Elia testified that she was a year older than Mr. Diaz. She explained that their father was a drug dealer and had been in and out of prison. After their father had been released from prison in 2010, he was deported, then murdered in 2019. Elia testified that after their father's second arrest, Mr. Diaz became depressed, became sick, and was diagnosed with bulimia and anorexia. His weight dropped from 140 pounds to 85 pounds. Elia recounted that Mr. Diaz was regularly bullied by gang members and as a result he joined a gang at the end of his freshman year of high school for protection.

¶ 14    While incarcerated, Mr. Diaz advised Elia about her electrical contracting and snow removal business. He designed her business logo and advised her to seek a minority- and woman-owned certification to help her get into government contracting. She stated that she would employ Mr. Diaz whenever he was released and that he was welcome to live with her and her family.

¶ 15    Mr. Diaz also presented testimony from Dr. Garbarino, an expert in juvenile psychology and juvenile brain development. Dr. Garbarino testified that minors' developing brains are immature with respect to "executive function" and "emotional regulation." He stated that minors' stunted brain development predisposes those who grow up in areas with drugs and gangs to express themselves in terms of violent behavior. He testified that studies show that the presence of peers increases the likelihood of juvenile misbehavior. He did not find reason to believe that Mr. Diaz's

brain development was different from that of a typical 17 year old, nor that he was incapable of rehabilitation.

¶ 16    Defense counsel presented Mr. Diaz's high school diploma from King's Word Academy Adult High School, which showed a 3.91 grade point average. Defense counsel explained that Mr. Diaz found the diploma program through his own initiative, as no such program was available to him at Menard Correctional Center. He also presented numerous certificates for completed course work in bible and religious studies, education classes, jobs and trades, and life skills.

¶ 17    Mr. Diaz's mitigation packet also included documentation showing that in July and August of 2021, he was taking paralegal courses with the Blackstone Career Institute. He scored at least 95% on eleven exams. Mr. Diaz also successfully completed the educational programming necessary to earn a sentence reduction, though he did not qualify due to the nature of his offense. The packet also contained receipts from his donations to "The Rebound Foundation," "Feed My Starving Children," and St. Jude Children's Research Hospital.

¶ 18    The packet also included a children's book that Mr. Diaz wrote and illustrated, titled "Blue and Yellow Friends." The story depicts two different-colored birds who are initially apprehensive of each other but become friends after realizing that appearances are unimportant and that they have many similarities. Mr. Diaz created the book to educate children and to promote peace and understanding.

¶ 19    Mr. Diaz gave a written statement. He apologized to the Dezort family, specifically, "from the bottom of my heart I'm sincerely, truly, and deeply sorry for taking Nico's life away." He took full responsibility for his actions, which were "wrong and inexcusable." He expressed remorse and stated that he would "always have a life sentence of guilt, trauma, depression, and sadness."

¶ 20    In its finding, the trial court stated that it had "considered all of the above aggravation and mitigation" and found that "[t]his was a senseless murder." The court then stated:

> "Defendant was not influenced by peers, but directed the action – he false flagged the group Nico Dezort was in, directed the ride to get a gun and ride back to the scene. He covered his face and exited the car with a gun and a smart mouth, and purposefully shot 17 year old Nico DeZort in the back while he was running away from the defendant. This court finds this crime was motivated by gang rivalry and his sentence is necessary to deter others from the same activity. Defendant continued to maintain gang activity in prison.
>
> Defendant was not suffering from a cognitive disability and was 17, almost 18, on June 25, 2007. He participated meaningfully in his defense, testified at trial and made a well written statement of allocation in the prior sentencing hearing. Defendant was raised in a loving, large family, which celebrated holidays together with no evidence of emotional, physical or sexual abuse, and maintains a loving relationship with his mother, siblings, and other family members. His father went to prison for drug dealing, which his family was not ashamed of, was then deported and later murdered. This negatively impacted defendant. He has made great efforts to better himself in prison and to be employable upon release and expressed genuine remorse. This court finds defendant is not incorrigible and declines to impose a sentence enhancement for personally discharging a firearm that proximately caused death."

¶ 21    The trial court then sentenced Mr. Diaz to 35 years' imprisonment to be followed by 3 years mandatory supervised release. Mr. Diaz now appeals this sentence.

¶ 22                                ANALYSIS

¶ 23    We note that we have jurisdiction to consider this matter, as Mr. Diaz filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017); see also *People v. English*, 2023 IL 128077, ¶ 25.

¶ 24    On appeal, Mr. Diaz argues (1) his 35-year sentence violates the Illinois Constitution's Proportionate Penalties Clause as applied to him; (2) his sentence is excessive; and (3) he was denied a fair sentencing hearing.

¶ 25                          A. Proportional Penalties Clause

¶ 26    The Proportionate Penalties Clause requires that all penalties "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1790, art. I, § 11. A criminal sentence violates this clause when it is "so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 228-29 (2002).

¶ 27    The Supreme Court has made a distinction between juveniles and adults for the purposes of sentencing. See *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (children have a lack of maturity, an underdeveloped sense of responsibility, and are more vulnerable to negative influences and outside pressures); see also *Graham v. Florida*, 560 U.S. 48, 72 (2010) (juveniles have diminished culpability and greater prospects for reform as "they are less deserving of the most severe punishments").

¶ 28    In *Miller v. Alabama,* 567 U.S. 460, 498 (2012), the Supreme Court held that mandatory life sentences for juveniles violate the Eighth Amendment's (U.S. Const. amend VIII) prohibition against cruel and unusual punishment. However, trial courts are not prohibited from sentencing a juvenile to a life sentence without parole, but must first consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016) (quoting *Miller*, 567 U.S. at 480).

¶ 29    Expanding on the principles outlined in *Miller*, the Illinois Supreme Court ruled that a prison sentence of over 40 years imposed on a juvenile offender constitutes a *de facto* life sentence. *People v. Buffer*, 2019 IL 122327, ¶ 41. Sentences of more than 40 years including natural life were not prohibited "so long as the sentence is at the trial court's discretion rather than mandatory," having been imposed by statute. *People v. Davis*, 2014 IL 115595, ¶ 43; see *Miller*, 567 U.S. at

480 (holding mandatory penalty schemes prevent the sentencer from considering the central characteristics of juveniles). The Illinois General Assembly addressed the *Miller* concerns by giving judge's discretion to impose firearm enhancements, rather than requiring them to be mandatory and directing the courts to consider specific youth-related mitigating factors when sentencing a juvenile. See 730 ILCS 5/5-4.5-105(a), (b). Those factors are:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influence;
>
> (3) the person's family home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;
>
> (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;
>
> (5) the circumstances of the offense;
>
> (6) the degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;
>
> (7) whether the person was able to meaningfully participate in his or her defense;
>
> (8) the person's prior juvenile or criminal history; and
>
> (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

¶ 30    Here, Mr. Diaz argues that his sentence violates the proportional penalties clause as applied to him because the court failed to consider his individual circumstances and failed to consider several youth-related factors. Additionally, he argues that the trial court improperly assigned greater weight to deterrence than to his rehabilitation. Though this court has found that "deterrence

is diminished in juvenile sentencing because juveniles' recklessness, immaturity, and impetuosity make them less likely to consider possible punishment," (*People v. Morris*, 2017 IL App (1st) 141117, ¶ 33) it does not follow that deterrence may not be considered at all. See *People v. Smith*, 2022 IL App (4th) 200666, ¶ 30 (sentencing courts can consider deterrence of others in imposing a discretionary sentence on a juvenile offender).

¶ 31    In this case, the trial court considered each factor outlined both in *Miller* and by Illinois statute.  Here, the court made findings that Mr. Diaz was not incorrigible and noted Mr. Diaz had "made great efforts to better himself in prison." The court also addressed his age, his level of participation in the offense, and his familial background. Therefore, it cannot be concluded that deterrence was the court's focus when imposing Mr. Diaz's sentence. See *People v. Haynie*, 2020 IL App (1st) 17251, ¶ 35 ("The [trial] court's focus on deterrence, in particular, is incongruous with *Miller*'s concern regarding the sentencing of juvenile defendants").  Taking the entire record together, we do not find deterrence was given improper weight in the imposition of Mr. Diaz's sentence.

¶ 32    Further, he contends that even if the trial court did not sentence him to a *de facto* life sentence, his sentence can still violate the Proportionate Penalties Clause. He directs us to find this court's holding in *People v. Aikens*, 2016 IL App (1st) 133578 to be applicable here.

¶ 33    In *Aikens*, the trial court sentenced the defendant to 20 years' imprisonment for his attempted murder convictions with an additional mandatory 20-year enhancement for personally discharging a firearm, for a total sentence of 40 years' imprisonment. *Id.* at ¶ 1. The defendant argued that the adult sentencing scheme for attempted murder of a peace officer violated the proportionate penalties clause as applied to him. *Id.* at ¶ 33.

¶ 34 This court relied on *Leon Miller,* 202 Ill. 2d 328, and *People v. Gipson*, 2015 IL App (1st) 122451, in its holding. *Id.* at 37. In both cases, the trial court was unable to consider facts pertaining to the defendants' youth before imposing certain mandatory penalties. In *Aikens*, the trial court was also restricted from considering facts such as, the defendant's lack of prior criminal history and potential for rehabilitation, before imposing a mandatory firearm enhancement. 2016 IL App (1st) 133578, ¶ 37. Therefore, this court remanded the case for resentencing without the imposition of the mandatory enhancement. *Id.* at 38.

¶ 35 We do not find *Aikens* to be instructive in this case. Here, the trial court was not bound to a mandatory sentencing structure. Unlike in Aikens, the trial court exercised its discretion and elected not to impose a sentence enhancement for the discharge of a firearm. Furthermore, the record reflects that the trial court did consider both aggravating and mitigating factors. Thus, we find that Mr. Diaz's claim of a violation of the proportionate penalties clause as applied to him is without merit.

¶ 36                                  B. Excessive Sentence

¶ 37 Mr. Diaz then argues that while his sentence was within applicable statutory limits, the sentence was nevertheless excessive. A trial court has "broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We give "substantial deference" to the circuit court's sentencing decision because the trial judge "is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. A sentence within statutory limits will only be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is "greatly at variance with

the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacy*, 193 Ill. 2d 203, 210 (2000).

¶ 38 As previously stated, the Illinois General Assembly enacted a list of factors consistent with *Miller* that the trial court must consider when sentencing a juvenile. 730 ILCS 5/5-4.5-105(a) (West 2016). Mr. Diaz argues that the trial court failed to give proper weight to his rehabilitation evidence when it imposed a 35-year sentence. He states that because the court's written order "barely acknowledged" Mr. Diaz's attempts at rehabilitation and his genuine remorse, the sentence is excessive. Additionally, he argues that the court's emphasis on the gang-related nature of the offense and focus on deterrence contradicted Illinois law regarding the mitigating characteristics of youth.

¶ 39 Mr. Diaz relies heavily on *People v. McKinley*, 2020 IL App (1st) 191907, to support this argument. In *McKinley*, the defendant's *de facto* life sentence was vacated and remanded based on *Miller. Id.* at ¶ 21. Following the defendant's resentencing hearing, the trial judge imposed a 39-year sentence. *Id.* at ¶ 52. The defendant argued that the trial court abused its discretion when it failed to properly consider the defendant's "demonstrated and well-documented rehabilitation." *Id.* at ¶ 69.

¶ 40 In its reasoning, this court looked at the defendant's extensive education and his lack of infractions while in prison. *Id.* at ¶ 75. Despite this record, the trial court made "brief, general references to defendant's rehabilitation" which indicated his disregard of the "extent of defendant's rehabilitation and did not afford it adequate weight." *Id.* at ¶ 78. This court found that the defendant was the "epitome of an offender who has been restored to useful citizenship" but his sentence imposed by the trial court was not reflective of such. Therefore, we held that the trial

court abused its discretion because the sentence was "imposed with little regard to the defendant's significant rehabilitation." *Id.* at ¶ 72. Additionally, this court found that the trial court gave "improper weight" to the need of deterring future criminal conduct based on his statement that he had "considered all of those new factors for someone who is 16 years old but the sentence must deter future criminal conduct." *Id.* at ¶ 89.

¶ 41 This case is quite different. While like Mr. McKinley, Mr. Diaz presented a lot of mitigation including certificates, program participation and remorse, as the State points out, Mr. McKinley had been a model prisoner while Mr. Diaz had several findings of serious misconduct in prison, including gang activity as recently as February 2019. In considering the other factors, the court highlighted Mr. Diaz's familial upbringing, calling his relationship with his father a "double-edged sword" due to his father's time in prison for drug dealing. The court also noted that Mr. Diaz was negatively influenced by older gang members but did not find that he was influenced by peers, noting that he "directed the action" in this case. Neither the statute nor the *Miller* cases require courts to elevate a single factor above the others.

¶ 42 We do not find an abuse of discretion based on the considerations made by the trial court. Nor is the imposed sentence "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacy*, 193 Ill. 2d at 210. Though Mr. Diaz argues that his potential for rehabilitation was not given proper weight, we must not substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *Stacy*, 193 Ill. 2d at 209.

¶ 43                                    C. Sentencing Factors

¶ 44   Finally, Mr. Diaz argues that the trial court considered improper factors and, therefore, denied him a fair sentencing hearing. Specifically, he claims the court: (1) incorrectly relied on a factual error which improperly disregarded Mr. Diaz's youth; (2) misunderstood "negative influences and outside pressure" as a mitigating factor for juvenile offenders; and (3) improperly considered an inordinate number of victim impact statements in aggravation.

¶ 45   Beginning with his first contention, Mr. Diaz argues that the trial court improperly relied on the "incorrect belief" that Mr. Diaz had "false flagged" the Milwaukee Kings. He contends that this "factual error" disregards that the shooting "was a product of his juvenile immaturity, impetuosity, and recklessness." As previously stated, we find that the trial court appropriately weighed all relevant factors in imposing Mr. Diaz's sentence. Accordingly, the trial court "having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *Alexander*, 239 Ill. 2d, at 213.

¶ 46   Second, Mr. Diaz argues that the trial court improperly misunderstood the "negative influences and outside pressure" as a mitigating factor for juvenile offenders. However, reliance on an improper factor in aggravation "does not always necessitate remandment for resentencing." *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). When the record demonstrates that "weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, the remandment is not required." *Id.*

¶ 47   Finally, Mr. Diaz argues that the court improperly considered "an inordinate number" of victim impact statements in aggravation. Section 6 of the Rights of Crime Victims and Witnesses Act (725 ILCS 120/6(a) (West 2020)) allows persons impacted by crime to present a written statement in any case a defendant has been convicted of a violent crime.  However, like any other

aggravating factor, it is at the trial court's discretion to weigh the victim impact statements against mitigating factors. Here, the trial court noted the additional, unsworn impact statements and appropriately weighed them against Mr. Diaz's mitigation. See *People v. Hestand*, 326 Ill. App. 3d 272 (2005) (where the trial court noted the victim impact statements were unsworn and gave them appropriate weight, the reviewing court found no violation of due process). Again, we find that the trial court appropriately weighed all factors of aggravation and mitigation appropriately. Thus, we do not find the court's imposition of Mr. Diaz's sentence to be an abuse of discretion. Accordingly, we affirm Mr. Diaz's sentence.

¶ 48                                    CONCLUSION

¶ 49    For the foregoing reasons, we affirm judgement of the circuit court.

¶ 50    Affirmed.